UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPOLETO CORPORATION<br><br>　　　　　　　　　　Plaintiff,<br><br>　vs.<br><br>ETHIOPIAN AIRLINES GROUP (A/K/A ETHIOPIAN AIRLINES ENTERPRISE).<br><br>　　　　　　　　　　Defendant. | Civil Action No. _____<br><br>**COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

This is an action for breach of contract, aiding and abetting breach of fiduciary duty, and fraud against Ethiopian Airlines Group arising out of the malfeasance alleged below.

## INTRODUCTION

1. Plaintiff Spoleto Corporation ("Plaintiff") is the assignee of Arena Riparian (Cayman), LLC ("Arena Riparian (Cayman)") to a June 18, 2018 Aircraft Sale Agreement (the "Purchase Agreement") between Arena Riparian (Cayman) and Defendant Ethiopian Airlines Group ("Ethiopian Airlines").

2. Under the Purchase Agreement, Ethiopian Airlines agreed to sell Arena Riparian (Cayman) four Boeing 757 airframes and ten Pratt & Whitney 2040 jet engines for a steeply discounted purchase price of $14.5 million. Arena Riparian (Cayman) had, in turn, secured a buyer for the equipment and stood to make a substantial profit.

3. Because it was bribed to do so, and/or for other reasons, Defendant Ethiopian Airlines breached its deal with Arena Riparian (Cayman).

4. Defendant Ethiopian Airlines's breach of the Purchase Agreement was egregious and intentional, and its secret dealings with CSDS and Sirimanne were only recently discovered. Defendant is also liable for aiding and abetting Sirimanne's breach of his fiduciary duties to Arena Riparian (Cayman) as well as for defrauding Arena Riparian (Cayman).

## THE PARTIES

5. Plaintiff is a Delaware Corporation with its principal place of business at 420 Lexington Avenue, Suite 1402, New York, New York, 10170.

6. Defendant Ethiopian Airlines is an Ethiopian public enterprise organized under the laws of Ethiopia with a principal place of business in Ethiopia at Bole International Airport, P.O. Box 1755, Addis Ababa, Ethiopia.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of Delaware and New York and Defendant is a corporate citizen of Ethiopia.

8. Plaintiff's damages are for an amount to be determined at trial but at this time are believed to be more than $10 million, exclusive of interest and costs, and not including punitive damages.

9. Moreover, Ethiopian Airlines transacts business in New York and has consented to personal jurisdiction and venue in this Court under Section 19.2 of the Purchase Agreement (Exhibit 1), which provides that each of the parties:

> "hereby irrevocably and unconditionally submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the City and County of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement . . . Each of [the parties] hereby irrevocably and unconditionally waives, to the fullest extent it may effectively do so, any defense or objection that they may now or hereafter have of an inconvenient forum to the maintenance of such action or

proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile."

## FACTUAL BACKGROUND

10. In early 2017, principals of Arena Investors, LP ("Arena") entered into a joint venture with non-party Riparian Aviation Partners, LLC for the purchase and resale of commercial aircraft and engines (the "JV").

11. Riparian Aviation Partners, LLC had four partners: Christopher Chaput, Benedict Sirimanne, Christopher Keller, and Henry Chen. The four members pooled their resources to share the profits and losses from their involvement in the purchase and resale of the aviation equipment. Arena, Sirimanne, Keller, Chaput, and Chen agreed to share in the management and operation of the JV. Arena would primarily provide capital, management experience, industry connections, and finances for legal and diligence expenses, while Riparian Aviation Partners would identify aircraft purchase opportunities for the JV.

12. To effectuate the purchase and resale of the aviation equipment, the JV created Arena Riparian (Cayman) with three members, Arena RAP (Cayman), LLC; Riparian Aviation Partners, LLC; and Arena SPV Manager, LLC. Arena RAP (Cayman), LLC held 100% of the class A shares, Riparian Aviation Partners, LLC held 100% of the class B shares, and Arena SPV Manager, LLC was the managing member of the LLC.

**A. Early Negotiations with Defendant Ethiopian Airlines**

13. In early 2017, the JV began negotiating a potential deal with Defendant Ethiopian Airlines under which the JV would acquire five Boeing 757 airframes and twelve Pratt & Whitney 2040 jet engines.

14. Over the course of these negotiations, the JV entered into two letters of intent with Defendant Ethiopian Airlines concerning this equipment.

15. During these early negotiations, Benedict Sirimanne led many of the discussions with Defendant on behalf of the JV.

**B. Benedict Sirimanne and Christopher Keller Steal The Military Aircraft**

16. Despite knowing that they owed fiduciary duties to the JV, Sirimanne and Keller breached those duties in early 2018 and stole one of the five airframes and two of the engines for themselves. The aircraft they stole had been held by the Ethiopian Air Force and was therefore known as the "Military Aircraft." Sirimanne and Keller lied to and misled the JV about their secret dealings with Defendant Ethiopian Airlines.

17. On May 7, 2018, Defendant Ethiopian Airlines entered into a contract with CSDS (*i.e.*, Sirimanne's company) for the Military Aircraft. Defendant produced a bill of sale for the aircraft on May 15, 2018.

18. In a departure from industry custom and practice, and on information and belief, CSDS did not pay Defendant Ethiopian Airlines for the Military Aircraft at the time CSDS and Ethiopian Airlines executed their bill of sale. The JV learned from Defendant Ethiopian Airlines's VP Legal Counsel & Corporate Secretariat, Genanaw Assefa, that Defendant, a sophisticated entity with billions of dollars in revenue, was not paid due to an "administrative error."

19. Sirimanne and Keller hid this transaction from the JV for months.

**C. The Purchase Agreement With Arena Riparian (Cayman)**

20. On June 18, 2018, Arena Riparian (Cayman) entered into the Purchase Agreement with Defendant Ethiopian Airlines. Under this contract, Defendant agreed to sell Arena Riparian (Cayman) the remaining four Boeing 757 air frames labeled with Manufacturer Serial Numbers ("MSNs") 24845, 25014, 25353, and 26057; and the remaining ten Pratt & Whitney 2040

Engines with Engine Serial Numbers ("ESNs") 726615, 726507, 726641, 726588, 726541, 726625, 726672, 717984, 726530, and 726671 (the "Assets") for a purchase price of $14.5 million.

21. The Purchase Agreement is solely between Arena Riparian (Cayman) as "Buyer" and Defendant Ethiopian Airlines as "Seller." The contract does not mention CSDS, Sirimanne, or Keller in any way.

22. When Arena Riparian (Cayman) sent the fully executed version of the Purchase Agreement to Defendant Ethiopian Airlines, Mehari Etay (an Ethiopian Airlines attorney) asked Deepak Reddy (an attorney for Arena Riparian (Cayman)) why Sirimanne did not sign the Purchase Agreement.

23. Mr. Reddy explained that a duly authorized representative of the buyer, Arena Riparian (Cayman), signed the Purchase Agreement. Etay replied, "Accepted" in response to Mr. Reddy's explanation.

24. At this point, Arena Riparian (Cayman) put $1,000,000 into escrow as a deposit for the Purchase Agreement (in addition to $800,000 in funds that the JV had already provided pursuant to earlier LOIs).

25. Arena Riparian (Cayman) also proceeded with diligence and the pre-closing activities under the Purchase Agreement.

**D. Defendant Ethiopian Airlines Accepts Bribes from Sirimanne**

26. On June 21, 2018—just three days after Defendant signed the Purchase Agreement with Arena Riparian (Cayman)—Sirimanne began to pressure Defendant to breach and abandon the Purchase Agreement in favor of a more lucrative deal with Sirimanne and Keller.

27. Sirimanne did not just offer more money for the Assets: he also offered cash bribes of "about $50,000."

28. Defendant Ethiopian Airlines and its employees readily accepted these bribes.

29. For example, Retta Melaku, Defendant's head of engineering, negotiated bribes with Sirimanne both in Ethiopia as well as over text messages.

30. On information and belief, on June 21, 2018, Sirimanne offered Melaku $10,000 over a text message.

31. Sirimanne continued to message Melaku that day offering money in exchange for Melaku's influence. Sirimanne confirmed at deposition, under oath, that his goal was to give Defendant money in exchange for its "influence." Deposition Tr. at 241:16-20 ("Q: And so giving them the money was what you meant by influence? A: Basically a motivation, yeah, so to speak.").

32. To be clear, bribery was not just a goal. Sirimanne has admitted in sworn testimony that he actually bribed Defendant Ethiopian Airlines as well as its employees. *See, e.g.*, Exhibit 2 (Sirimanne Deposition Tr.) at 231:4-10 ("***We paid approximately 16 to 18 people*** . . . . We paid their – we paid them at a rate of time and a half . . . . And we paid for their travel expenses and food ***and everything else they told us to pay***.") (emphasis added). Sirimanne further confirmed in sworn testimony that he gave CSDS's vice president, Alan Auger, who was physically in Ethiopia, "***carte blanche to get the job done***" and that "Alan paid [Ethiopian Airlines employees] ***mostly cash*** and . . . paid them according to what ***they were demanding to get paid***." Exhibit 2 (Sirimanne Deposition Tr.) at 236:7-12. Sirimanne added, "at the end of the day Auger would take them out to dinner." Exhibit 2 (Sirimanne Deposition Tr.) at 235:17-23.

6

33. Sirimanne further testified that he paid bribes of "***about $50,000 in total***." Exhibit 2 (Sirimanne Deposition Tr.) at 237:10-12.

34. When asked whether Defendant Ethiopian Airlines knew about these bribes, Sirimanne responded "Yes." Exhibit 2 (Sirimanne Deposition Tr.) at 237:13-24 ("Q: So you told [Ethiopian Airlines] that you were going to be paying their employees? A: We – we offered to pay them directly instead of them – them having to collect it from Ethiopian, ***that's correct***."). Sirimanne further added that Melaku helped coordinate at least "some" of these payments. Exhibit 2 (Sirimanne Deposition Tr.) at 245:6-10.

35. Moreover, Defendant gave Alan Auger of CSDS access to the Ethiopian offices, where he distributed those bribes. Exhibit 2 (Sirimanne Deposition Tr.) at 242:4-243:1; 245:6-8.

### E. AAR Agrees to Purchase the Assets from Arena Riparian (Cayman)

36. In early July 2018, prior to discovering Sirimanne and Keller's misconduct, Arena Riparian (Cayman) lined up a buyer for the Assets: AAR Corp.

37. The terms of the first agreement with AAR contemplated a sale of the Assets plus the Military Plane (which Arena Riparian (Cayman) did not know had been stolen) for a minimum purchase price of $27 million, subject to upward adjustment based on the condition of the equipment. In fact, the Assets were worth even more.

### F. Arena Riparian (Cayman) Discovers Sirimanne's Double Dealing

38. On July 17, 2018, Arena Riparian (Cayman) learned that Sirimanne and Keller had secretly purchased the Military Aircraft. Up until this point, Sirimanne had led Arena Riparian (Cayman) to believe that it was still on track to acquire this aircraft. Additionally, Defendant participated in this deception by ignoring Arena Riparian (Cayman)'s requests for documentation of the Military Aircraft sale to Arena Riparian (Cayman).

39. Arena Riparian (Cayman) is suing Sirimanne, Keller, and CSDS in state court for, *inter alia*, their breaches of their fiduciary duties concerning this aircraft.

**G. Arena Riparian (Cayman) Advises Defendant Ethiopian Airlines of Sirimanne's Double Dealing**

40. On July 18, 2018, Arena Riparian (Cayman) wrote a letter to Defendant Ethiopian Airlines including Ethiopian Airlines agents Mehari Etay (Senior Attorney), Retta Melaku (Director of MRO Sales and Marketing), Mesfin Tasew (COO), and Tewolde Gebremariam (CEO), informing Defendant Ethiopian Airlines that Sirimanne, Keller, and CSDS had "taken actions contrary to the interests of Arena Riparian (Cayman), LLC." As a result, Arena Riparian (Cayman) informed Defendant Ethiopian Airlines that "None of Sirimanne, Auger, Keller or CSDS are authorized to speak on behalf of Arena Riparian [(Cayman)] or represent Arena Riparian [(Cayman)] with respect to the [Purchase] Agreement."

41. The letter directed Defendant Ethiopian Airlines to "direct all communication with respect to [the Purchase Agreement] or Arena Riparian [(Cayman)] to Mr. Vivek Nayar and Mr. Christopher J. Chaput, both of whom are authorized to speak for and represent Arena Riparian."

42. On July 19, 2018, Chris Chaput emailed Defendant Ethiopian Airlines's representatives Etay, Assefa (Defendant's VP Legal Counsel and Corporate Secretariat), and Abebe. Chaput further explained the relationship between Arena Riparian (Cayman) and Sirimanne and Keller.

**H. Defendant Ethiopian Airlines Demands Additional Terms to the Purchase Agreement**

43. By July 19, 2018, there could be no question that Defendant Ethiopian Airlines understood Sirimanne's relationship to Arena Riparian (Cayman).

44. Nevertheless, Defendant Ethiopian Airlines repeatedly breached the Purchase Agreement and ultimately dumped it in favor of Sirimanne's cash bribes.

45. One of Defendant's tactics was delay.

46. The Purchase Agreement contained a provision that made the agreement terminable if a delay extended beyond July 31, 2018 (the "Outside Delivery Date").

47. Accordingly, Arena Riparian (Cayman) worked to complete diligence and any pre-closing activities so that the transaction could close before the Outside Delivery Date.

48. Defendant, on the other hand, conspired with Sirimanne and Keller to delay and frustrate Arena Riparian (Cayman)'s efforts to close the Purchase Agreement by the Outside Delivery Date.

49. On or about July 23, 2018, Chris Chaput and Vivek Nayar travelled to Ethiopia to meet with representatives of Defendant in an effort to salvage the deal. Chaput and Nayar, as representatives of Arena Riparian (Cayman), again explained Sirimanne's and Keller's relationship to Arena Riparian (Cayman) and informed Defendant that Sirimanne and Keller had breached their fiduciary duties to Arena Riparian (Cayman).

50. At this meeting, Defendant Ethiopian Airlines reaffirmed its commitment to the Purchase Agreement. Indeed, Defendant suggested and agreed to an extension of the Outside Delivery Date to August 31, 2018 to ensure their compliance with the Purchase Agreement (the "Revised Outside Delivery Date"). However, Defendant concealed that it had ongoing discussions with Benedict Sirimanne regarding the Purchase Agreement. Defendant also continued to conceal that it had accepted tens of thousands of dollars in bribes from Sirimanne and CSDS.

51. Arena Riparian (Cayman) relied on Defendant's representations and proceeded to prepare to close pursuant to the Purchase Agreement. Indeed, Arena Riparian (Cayman) produced various diligence documents at the request of Defendant regarding various Arena entities and spent hundreds of thousands of dollars in costs related to contract negotiation, diligence preparation, and inspection as a result of Defendant's representations that the deal was moving forward as contemplated.

52. On July 27, 2018, just after Chris Chaput had returned from Ethiopia, Defendant Ethiopian Airlines requested—on extremely short notice—that Chaput return to Ethiopia for a second meeting with Defendant. Chaput attended yet another meeting, this time with Defendant's Legal Counsel and Corporate Secretariat, Genanaw Assefa, on August 2, 2018.

53. Genanaw Assefa acted as an agent of Defendant and represented his ability to control Defendant Ethiopian Airlines's actions related to the Purchase Agreement.

54. At this in-person meeting, behind closed doors, Assefa insisted on adding new obligations to the Purchase Agreement. Assefa told Chaput that he needed to ask for more than was required under the Purchase Agreement because he needed to incent his boss, the CEO, to honor the deal with Arena Riparian (Cayman) rather than pursue the CEO's inclination, which was to do a deal instead with Sirimanne, who the CEO had met earlier that year. Assefa also asked Chaput about the "profit potential" of the Purchase Agreement. Chaput left the meeting with the impression that Assefa wanted Arena Riparian (Cayman) to pay for the opportunity to complete the Purchase Agreement that the parties had already signed. Subsequent to this meeting, Defendant demanded that Arena Riparian (Cayman) contribute an additional $1 million deposit in escrow.

55. After the August 2, 2018 meeting, Defendant requested even more additional terms—one of which was that Arena Riparian (Cayman) indemnify Defendant for any cause of action that might be brought against it by CSDS, Sirimanne, or Keller. On August 6, 2018, Arena Riparian (Cayman) agreed to Defendant's demands with only minor modifications. Defendant responded on August 8, 2018 with further modified terms and requested *an additional $1 million non-refundable deposit* paid directly to Defendant.

56. Defendant further demanded that all previous deposits be non-refundable.

57. The parties prepared a separate agreement to memorialize the Revised Outside Delivery Date.

58. Defendant continued to negotiate with Arena Riparian (Cayman) well into August 2018 but never signed the extension that it agreed to in person.

59. Meanwhile, on August 2, 2018, Arena Riparian (Cayman) renegotiated its agreement with AAR and entered into a new agreement (the "Second AAR Agreement"), which contained a provision wherein the parties could adjust the purchase price in the event that the Military Aircraft and its engines were not included along with the Assets.

60. AAR remained a ready and willing buyer from Arena Riparian (Cayman), and Arena Riparian (Cayman) stood to make millions of dollars in profit from the transaction.

61. Arena Riparian (Cayman) relied on representations made by Defendant and its officers that the Purchase Agreement was not in jeopardy when it signed the Second AAR Agreement.

62. Arena Riparian (Cayman) was not able to close on the Second AAR Agreement due to Defendants' purposeful misrepresentations, and Arena Riparian (Cayman) suffered significant reputational harm as a result.

**I. Defendant Ethiopian Airlines Blocks the Purchase Agreement from Closing**

63. During July and August 2018, while negotiating with Arena Riparian (Cayman), Defendant secretly negotiated simultaneously with Benedict Sirimanne for the Assets.

64. On July 31, 2018, Sirimanne emailed Defendant Ethiopian Airlines, writing that "[a]fter the 31st of July, Ethiopian has no further obligation or any liability to Arena Riparian (Cayman) LLC.  CSDS has already performed as agreed with Ethiopian on the first part of the deal and we fully inten[d] to complete the second part in very short order . . . I will be in Ethiopia on the 15th of August to fully complete the agreed transaction per the draft agreement I sent you a few days back.  I will await your comments on that agreement."

65. After receiving this email (and Sirimanne's tens of thousands of dollars in cash bribes), Defendant intentionally delayed Arena Riparian (Cayman)'s diligence and investigation yet again, such that Arena Riparian (Cayman) would not be able to close by the Outside Delivery Date.

66. In particular, Defendant Ethiopian Airlines was obligated to arrange for the inspection of the Assets under Section 5.2 of the Purchase Agreement, which requires Defendant to "arrange the delivery inspection of the Aircraft with the Buyer."  To complete this inspection, Arena Riparian (Cayman), at significant cost, sent inspectors from AAR, its technical consultant, to Ethiopia to inspect the aircraft.

67. Defendant Ethiopian Airlines prevented the AAR inspectors from inspecting the aircraft when they visited Ethiopia by, *inter alia*, refusing to give the AAR inspectors access to the airport—without explanation—and preventing them from performing any inspections.  Providing access to aviation inspectors is a basic and standard procedure in the industry.

68. Throughout August 2018, Arena Riparian (Cayman) continued to complete all of its diligence work in good faith to close the transaction by the Revised Outside Delivery Date.

69. Defendant Ethiopian Airlines, however, continued to obstruct. For example, Defendant refused to provide updated visa invitation letters to Arena Riparian (Cayman)'s inspectors—and thus blocked their return to Ethiopia to complete the aircraft inspections as required by the Purchase Agreement.

70. Defendant Ethiopian Airlines is wholly owned by the Ethiopian government and without question had the ability to provide the appropriate letters that would have granted the inspectors access. In fact, Defendant Ethiopian Airlines had previously provided invitations in 2017.

71. Ultimately, it became clear to Arena Riparian (Cayman) that Defendant was purposefully delaying the process and blocking Arena Riparian (Cayman) from closing the Purchase Agreement.

**J. Defendant Ethiopian Airlines Terminates the Purchase Agreement in Bad Faith**

72. On August 16, 2018, Defendant Ethiopian Airlines sent yet another round of revised terms to Arena Riparian (Cayman).

73. About a week later, on or about August 23, 2018, Defendant met with Sirimanne in Ethiopia to discuss their alternative transaction. By August 25, Defendant had drafted a new transaction with CSDS for the Assets.

74. On August 28 and 30, 2018, Arena Riparian (Cayman) sent letters to Defendant through counsel noting Ethiopian Airlines's breach of Section 5.2 of the Purchase Agreement. Despite Defendant's breaches, Arena Riparian (Cayman) still offered to complete the deal.

75. Counsel for Defendant responded on August 31, 2018, falsely claiming that Arena Riparian (Cayman) refused to take delivery of the Assets and attached a notice of termination dated four days earlier, August 27, 2018.

**K. Defendant Ethiopian Airlines Takes a $1 Million Kickback from Sirimanne**

76. On September 13, 2018, less than two weeks after Defendant Ethiopian Airlines wrongfully terminated the Purchase Agreement with Arena Riparian (Cayman), Defendant sold the Assets to Benedict Sirimanne for *$15,500,000—i.e., $1,000,000 above what Defendant Ethiopian Airlines had agreed to accept from Arena Riparian (Cayman)*.  Thus, in total, Defendant Ethiopian Airlines accepted at least $1,050,000 in bribe money from Sirimanne in exchange for breaching its contractual duties to Arena Riparian (Cayman).

77. Defendant's breach of the Purchase Agreement precluded Arena Riparian (Cayman) from completing its anticipated deal to sell the Assets to AAR, thus denying Arena Riparian (Cayman) its expected profits.  In addition, Arena Riparian (Cayman) suffered hundreds of thousands of dollars in out-of-pocket costs as well as reputational damages because of Defendant's breaches and tortious conduct.

## FIRST CAUSE OF ACTION

**(Breach of Contract for the Purchase Agreement)**

78. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

79. As reflected in the Purchase Agreement, Arena Riparian (Cayman) had an agreement with Ethiopian Airlines for the purchase of the Assets.

80. Arena Riparian (Cayman) and Ethiopian Airlines had a binding agreement supported by sufficient consideration for the sale of the Assets for $14.5 million.

81. Ethiopian Airlines breached Section 5.2 of the Purchase Agreement, which requires seller, Defendant, to arrange the delivery and inspection of the Aircraft with Buyer, Arena Riparian (Cayman).

82. Ethiopian Airlines breached Section 14 of the Purchase Agreement, which enumerates the "excusable" delays that are acceptable for delivery of the aircraft. Defendant did not have an excusable delay and as such breached the Purchase Agreement when it did not deliver by the Outside Delivery Date or the Revised Outside Delivery Date.

83. Defendant Ethiopian Airlines purposefully undermined the Purchase Agreement in order to reap the benefits of Section 14.2(a), which allows termination after the Outside Delivery Date, in bad faith.

84. The Purchase Agreement is a valid, binding, and enforceable contract.

85. Arena Riparian (Cayman) has complied in all material respects with its obligations under the Purchase Agreement.

86. Plaintiff has been damaged by Ethiopian Airlines's breach in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty)

87. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

88. Sirimanne and Keller owed fiduciary duties to Arena Riparian (Cayman) as Class B Members of Arena Riparian (Cayman).

89. Sirimanne and Keller breached their fiduciary duties by actively working against Arena Riparian (Cayman)'s interest in their separate negotiations with Defendant and by assisting Defendant in its breach of the Purchase Agreement.

90. Defendant had knowledge of Sirimanne's and Keller's misconduct through the July 18, 2018 letter from Arena Riparian (Cayman), the July 19, 2018 email from Christopher Chaput, and the early August 2018 meetings with Chaput and Nayar.

91. Defendant substantially assisted Sirimanne and Keller's misconduct by continuing to negotiate with them after being informed of their double dealing and by accepting bribe payments from them to the detriment of Arena Riparian (Cayman).

92. Defendant provided further substantial assistance by purposefully undermining the Purchase Agreement itself and assisting CSDS, Sirimanne, and Keller in their concealment of an alternative transaction.

93. Defendant further assisted in the breach of duty by refusing to allow Arena Riparian (Cayman) or its agents access to inspect the Assets pursuant to the Purchase Agreement.

94. Defendant further assisted in the breach of duty by delaying execution of the agreed upon extension of the Purchase Agreement.

95. Defendant assisted Sirimanne's and Keller's breach of their fiduciary duties by refusing to disclose the existence of separate purchase agreements for the Assets and the other equipment in any of their communications to Arena Riparian (Cayman).

96. Defendant's actions in aiding and abetting Sirimanne's and Keller's breach of their fiduciary duties proximately caused harm to Arena Riparian (Cayman) by allowing CSDS, Sirimanne, and Keller to purchase the Assets for themselves.

97. Defendant Ethiopian Airlines through its substantial assistance of Sirimanne and Keller's breach is liable for aiding and abetting their breach of fiduciary duty against Plaintiff.

98. Plaintiff has been injured by Ethiopian Airlines's aiding and abetting breach of fiduciary duty in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### (Fraud)

99. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

100. From at least July 19, 2018 through August 31, 2018, Defendant misrepresented to Arena Riparian (Cayman) that Defendant intended to complete the Purchase Agreement.

101. Instead, Defendant delayed the transaction contemplated by the Purchase Agreement in an effort to discourage Arena Riparian (Cayman) from closing the deal. Defendant induced Arena Riparian (Cayman) to travel to Ethiopia twice, insisted that Arena Riparian (Cayman) agree to multiple revisions to the Purchase Agreement after it was executed, and denied Arena Riparian (Cayman)'s inspectors access to the Assets.

102. Arena Riparian (Cayman) relied on Defendant's representations to its economic detriment.

103. Arena Riparian (Cayman)'s out-of-pocket expenses incurred because of Defendant's fraud include:

   a. Costs for attorneys and other professionals to negotiate and revise the Purchase Agreement;

   b. Costs for attorneys and other professionals to complete the numerous unnecessary diligence requests made by Defendant Ethiopian Airlines;

    c. Costs for airline tickets, hotel stays, and other travel expenses for the trips to Ethiopia; and

    d. Expenses related to the hiring of AAR inspectors, including extraordinary amounts of time spent because Defendant did not allow access to the inspectors.

104. Plaintiff have been injured by Ethiopian Airlines's fraud in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Corp. respectfully requests that this Court enter judgment in favor of Plaintiff:

A. On Count I, against Ethiopian Airlines for breach of contract in an amount to be determined at trial, but currently believed to be in excess of $10,000,000.00;

B. On Count II, against Ethiopian Airlines for aiding and abetting a breach of fiduciary duty in an amount to be determined at trial, but currently believed to be in excess of $10,000,000.00;

C. On Count III, against Ethiopian Airlines for fraud in an amount to be determined at trial, but currently believed to be in excess of $100,000.00;

D. Punitive Damages in an amount to be determined at trial, but in no event less than $10,000,000.00;

E. Awarding prejudgment and post judgment interest at the rates allowed by law;

F. Awarding attorneys' fees and costs; and

G. Providing such other and further relief as this Court may deem just and proper.

DATED: June 18, 2021 WHITE & CASE LLP

*/s/ Joshua Berman*

1221 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200

*Attorneys for Spoleto Corporation*