UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPOLETO CORPORATION, | |
| Plaintiff, | 21 Civ. 5407 (PAE) |
| -v- | OPINION & ORDER |
| ETHIOPIAN AIRLINES GROUP a/k/a ETHIOPIAN AIRLINES ENTERPRISE, | |
| Defendant. | |

PAUL A. ENGELMAYER, District Judge:

This case involves a sale of aircraft frames and jet engines that went awry.  An agreement was in place under which defendant Ethiopian Airlines Group ("Ethiopian") was to sell such items to Arena Riparian (Cayman) ("Arena Riparian").  However, Ethiopian abandoned that agreement.  It instead sold the items to a different entity—one affiliated with Benedict Sirimanne ("Sirimanne"), a fiduciary of Arena Riparian.  Arena Riparian later sued Ethiopian in New York state supreme court.  That court dismissed all claims against Ethiopian, based in part on a clause in the agreement limiting Ethiopian's liability.

Plaintiff Spoleto Corporation ("Spoleto"), the assignee of Arena Riparian's rights arising out of the failed agreement, now sues Ethiopian a second time, in this Court.  Spoleto realleges claims of breach of contract, and aiding and abetting a breach of fiduciary duty, and alleges, for the first time, fraud.  It justifies the new lawsuit on the grounds of evidence it claims it obtained in deposition discovery from Sirimanne during the state lawsuit.  Spoleto casts Sirimanne's testimony as plausibly indicating that he bribed Ethiopian to induce its breach of the agreement with Arena Riparian.

Ethiopian now moves to dismiss under Federal Rule of Civil Procedure 12(b)(6).  It argues that the first two claims fail on grounds of *res judicata*, collateral estoppel, and failure to state a claim, and that the fraud claim fails because it duplicates the breach-of-contract claim. For the reasons that follow, the Court fully grants Ethiopian's motion to dismiss.

## I.  Background

### A.  Factual Background[1]

#### 1.  Early 2017–June 18, 2018: Negotiation and Formation of the Agreement

Spoleto is the assignee of "Arena Riparian's claims and rights arising from a June 18, 2018 purchase agreement" (the "Agreement") between Arena Riparian and Ethiopian.  AC ¶ 1. Under the Agreement, Ethiopian agreed to sell four Boeing 757 aircrafts and 10 Pratt & Whitney 2040 jet engines (the "Civil Assets") to Arena Riparian for $14.5 million.  *Id.* ¶ 2.

The Agreement came about as follows.  In early 2017, Arena Investors, LP and Riparian Aviation Partners, LLC ("Riparian") formed a joint venture creating Arena Riparian.  *Id.* ¶¶ 10, 12.  Arena Riparian had three members: Arena RAP (Cayman), LLC; Arena SPV; and Riparian.

---

[1] This factual account draws from the Amended Complaint ("AC") and its attached exhibits: a June 18, 2018 purchase agreement, Dkt. 20-1 ("Agreement"), and an excerpt of a December 4, 2020 deposition transcript of Sirimanne, Dkt. 20-2 ("Sirimanne Dep. Tr.").  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  The Court also takes judicial notice of the pleadings in Ethiopian's prior state court action, and certain orders in that action.  *See Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 321 (S.D.N.Y. 2015) (court may take judicial notice of complaints and other documents filed in other courts "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings" (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991))).  For the purpose of resolving a motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

*Id.* ¶ 12.  Riparian, in turn, had four partners: Christopher Chaput ("Chaput"), Henry Chen,

Cristopher Keller ("Keller"), and Sirimanne.  *Id.* ¶ 11.

In early 2017, Sirimanne and Keller, as fiduciaries for Arena Riparian, took the lead in

initial negotiations with Ethiopian.  *Id.* ¶¶ 13, 15–16.  Those negotiations were to arrange for

Arena Riparian's purchase of the Civil Assets and an additional military aircraft and two engines

(the "Military Assets," and together with the Civil Assets, the "Assets").  *Id.* ¶ 16.  Arena

Riparian entered two letters of intent, one for the Civil Assets and one for the Military Assets.  It

placed $800,000 in escrow for the Assets.  *Id.* ¶¶ 14, 24.

Soon after, Keller and Sirimanne allegedly breached their fiduciary duties to Arena

Riparian by inducing Ethiopian to enter into a May 7, 2018 contract to sell the Military Assets to

CSDS, a company owned by Sirimanne.  *Id.* ¶¶ 16–17.  On May 15, 2018, Ethiopian produced a

bill of sale memorializing that transaction.  *Id.* ¶ 17.  "For months," Sirimanne and Keller hid the

secret sale from Arena Riparian.  *Id.* ¶ 19.  During this time, Arena Riparian wrongly believed

that its purchases of the Military Assets and Civil Assets would go forward, pursuant to separate

purchase agreements it was still planning to enter with Ethiopian.  Arena Riparian also arranged

for a prospective buyer to which it planned to re-sell the Assets.  *See id.* ¶¶ 38–39.

On June 18, 2018, Arena Riparian entered into the Agreement with Ethiopian for the

Civil Assets—the Agreement at issue here.  *Id.* ¶ 20.  Arena Riparian and Ethiopian were the

only parties to the Agreement; it did not mention Sirimanne, Keller, or CSDS.  *Id.* ¶¶ 21–22.

The Agreement specified July 31, 2018 as the "Outside Delivery Date" by which the deal would

either close or lapse.  *Id.* ¶ 50; Agreement § 13.1.  According to the Agreement, Ethiopian was

obligated to "arrange the delivery inspection of the [Civil Assets] with" Arena Riparian.

Agreement § 5.2.  In the event of an inexcusable delay of delivery of any part of the Civil Assets

past the Outside Delivery Date, the Agreement limited Ethiopian's liability to "the [i]nitial [p]ayment, the [d]eposit and any other advance payments for such Aircraft." *Id.* § 14.2(b). After entering the Agreement, Arena Riparian placed $1 million in escrow in contemplation of its purchase of the Civil Assets. It began to take the steps necessary to close the deal. AC ¶ 25.

   2.   **June 21, 2018–July 17, 2018: Bribery Allegations as to Military Assets**

On June 21, 2018, Sirimanne began to "pressure" Ethiopian to back out of the Agreement and to sell the Civil Assets to CSDS instead at a higher price. *Id.* ¶ 26.

Sirimanne also allegedly paid what Spoleto terms "cash bribes of about $50,000." *Id.* ¶¶ 26–27 (quotation marks omitted). These payments were intended to prepare and expedite the delivery of the Military Assets to CSDS. Sirimanne Dep. Tr. at 231, 237. Of the $50,000, $10,000 was offered over text message to Retta Melaku ("Melaku"), Ethiopian's Head of Engineering and Director of MKO Sales and Marketing, in exchange for "influence" and as "a motivation." AC ¶¶ 30–31, 42. This sum was intended to be passed on to Ethiopian's employees. Sirimanne Dep. Tr. at 237, 241. Overall, the $50,000 was distributed among approximately 16–18 of Ethiopian's mechanics and maintenance workers on the Military Assets, who were paid for their work at a rate of 1.5 times their hourly wages, plus the costs of transportation to and from the Military Assets, meals, "and everything else they told [CSDS] to pay." AC ¶ 32 (quoting Sirimanne Dep. Tr. at 231). These payments were made in Ethiopia by CSDS Vice President Alan Auger ("Auger"), who had "carte blanche to get the job done" and "paid [Ethiopian's employees] mostly cash." *Id.* (quoting Sirimanne Dep. Tr. at 236). No written records of these payments were kept. *Id.* ¶ 35.

   3.   **July 17, 2018–September 13, 2018: Failure of the Agreement and Sale to CSDS**

On July 17, 2018, Arena Riparian learned that Ethiopian had sold the Military Assets to CSDS. *Id.* ¶ 40.  To prevent Sirimanne and Keller from interfering with the separate Agreement by which it would purchase the Civil Assets—the Agreement at issue here—Arena Riparian sent several communications to officials at Ethiopian.  On July 18, 2018, it told Ethiopian's Senior Attorney, Director of Sales, Chief Operating Officer, and Chief Executive Officer that Sirimanne, Keller, and CSDS had acted "contrary to" Arena Riparian's interests and that "[n]one of Sirimanne, Auger, Keller, or CSDS are authorized to speak on behalf of Arena Riparian or represent [it] with respect to the Agreement." *Id.* ¶ 42.  On July 19 and 20, 2018, Chaput and Arena Riparian's Vivek Nayar ("Nayar") sent several emails to Ethiopian clarifying Arena Riparian's organizational structure, stating that Sirimanne owed a fiduciary duty to Arena Riparian, and directing Ethiopian officials to communicate only with Chaput and Nayar about the Agreement. *Id.* ¶¶ 43–47.

Nonetheless, Ethiopian thereafter "conspired with Sirimanne and Keller to delay" pre-closing activities so that the parties would miss the July 31, 2018 Outside Delivery Date and the Agreement would lapse. *Id.* ¶¶ 49–52.

Around July 23, 2018, Chaput and Nayar allegedly met with Ethiopian officials to "salvage the deal" and orally agreed to an extended outside delivery date of August 31, 2018 (the "Revised Outside Delivery Date"). *Id.* ¶¶ 53–54.  On August 2, 2018, Chaput again met with Ethiopian's Legal Counsel and Corporate Secretary Genanaw Assefa ("Assefa"). *Id.* ¶ 56.  At that meeting, Assefa "insisted" on adding "new obligations" to the Agreement relating to the Civil Assets, ostensibly to persuade Ethiopian's CEO not to abandon the deal in favor of Sirimanne and CSDS. *Id.* ¶ 58.  Under the new terms, added between August 2 and 8, 2018, Arena Riparian was to indemnify Ethiopian against any cause of action that CSDS, Sirimanne, or

5

Keller might bring against them, and pay two additional, non-refundable $1-million deposits directly to Ethiopian. *Id.* ¶¶ 59–60.  On August 16, 2018, Ethiopian sent a new round of revised terms to Arena Riparian for approval.  *Id.* ¶ 76.  However, Ethiopian never signed a revised purchase agreement that included the Revised Outside Delivery Date.  *Id.* ¶¶ 61–62.

Ethiopian continued to delay closing, intending to let the Revised Outside Delivery Date lapse and ultimately sell the Civil Assets to CSDS.  *Id.* ¶¶ 67–69.  Spoleto alleges that Ethiopian breached its duty under § 5.2 of the Agreement to "arrange the delivery inspection of the Aircraft with [Arena Riparian]" when it denied Arena Riparian's inspectors access to the sites housing the Civil Assets and failed to provide updated visa letters to allow inspectors to travel to Ethiopia to finish the inspections.  *Id.* ¶¶ 70–71, 73, 78, 86.  Spoleto alleges that this "purposeful[]" undermin[ing]" of the Agreement constituted an "inexcusable delay" in breach of § 14 of the Agreement.  *Id.* ¶¶ 87–88.

On August 28 and 30, 2018, Arena Riparian notified Ethiopian of its alleged breach of § 5.2 of the Agreement.  But it nevertheless offered to complete the deal.  *Id.* ¶ 78.  Ethiopian, however, responded on August 31, 2018, by falsely claiming that Arena Riparian had breached by refusing to take delivery of the Civil Assets.  Ethiopian attached a notice of termination, dated August 27, 2018.  *Id.* ¶ 79.

On September 13, 2018, Ethiopian sold the Civil Assets to Sirimanne's CSDS for $15.5 million—$1 million more than the agreed-upon purchase price between Arena Riparian and Ethiopian.  *Id.* ¶¶ 2, 80.  The AC thus alleges that Ethiopian received a total of $1,050,000 in "bribe money from Sirimanne in exchange for breaching its contractual duties to Arena Riparian": the $50,000 paid to Ethiopian's employees and the $1 million in excess of the Agreement's purchase price.  *Id.* ¶ 80.

### 4.       The State Court Action

On September 6, 2018, Arena Riparian, Riparian, and Arena SPV Manager, LLC (the "Arena State plaintiffs") filed a complaint against Ethiopian, Sirimanne, and several other defendants in New York State Supreme Court.  NYSCEF 654429/2018 ("State Action") at Dkt. 1; *see also* Dkt. 21-3.  On September 12, 2019, the Arena State plaintiffs filed the first amended complaint in that action.  State Action at Dkt. 3; Dkt. 21-4 ("State FAC").

Relevant here, the State FAC included claims of a breach of contract ("Count 7") and a breach of the duties of good faith and fair dealing ("Count 8").  State FAC ¶¶ 143–54.  The contract at issue was the Agreement for the Civil Assets—the same Agreement at issue here.  *See id.* ¶¶ 43–45, 59–63, 144. Specifically, the State FAC alleges a breach of § 5.2 of the Agreement (failure to arrange for inspection and delivery of the Civil Assets).  *Id.* ¶ 147.  It alleges that "Sirimanne and Keller told [Ethiopian] that it should intentionally delay Arena Riparian's diligence and investigation" so that the Agreement would lapse "and that Sirimanne Keller could then enter into a separate purchase agreement for the [Civil Assets]."  *Id.* ¶ 65.  It alleges the same dilatory tactics as does the AC in this action.  The one area of factual detail absent from the State FAC but in the AC in this action concerns Sirimanne's payment of $50,000 to Ethiopian employees in connection with the sale of the Military Assets, which the AC casts as bribery. Those facts came to light during Sirimanne's deposition in the State Action.  *Compare* State FAC ¶¶ 59–78, *with* AC ¶¶ 47–62, 67–75.

On October 31, 2018, Ethiopian moved to dismiss claims against it in the State FAC for failure to state a claim.  State Action at Dkt. 15; Dkt. 21-7 ("First State MTD").  Relevant here, Ethiopian's motion to dismiss argued that Count 7 did not state a claim because the Agreement limited damages for breach to a refund of Arena Riparian's payments, and the State FAC did not allege that Ethiopian had failed to make such a refund.  First State MTD at 9–14.  As to Count 8,

the First State MTD argued that it duplicated Count 7 and that it improperly sought to impose duties on Ethiopian outside the Agreement.  *Id.* at 16–19.  On December 19, 2018, Arena Riparian filed an opposition to the First State MTD.  State Action at Dkt. 56; Dkt. 21-8.  On January 18, 2019, Ethiopian filed a reply.  State Action at Dkt. 67; Dkt. 21-9.

On March 20, 2019, Justice Barry R. Ostrager of the New York State Supreme Court heard argument on the First State MTD.  Dkt. 21-10.  At the close of argument, Justice Ostrager, in a brief ruling from the bench, dismissed both claims for failure to state a claim, under New York Civil Practice Law and Rules § 3211(a)(7) ("N.Y. C.P.L.R.").  He dismissed the breach-of-contract claim (Count 7) on the ground that "[Ethiopian] is protected by the limitation of liability language in [the Agreement]."  He dismissed the claim for breach of the duties of good faith and fair dealing (Count 8) on the ground that the Agreement created "no contractual duty to extend the closing date" or "to negotiate exclusively with [Arena Riparian]."  *Id.* at 13–14.  On the order dismissing Count 7 and Count 8, Justice Ostrager checked a box that marked it as a "non-final disposition."  State Action at Dkt. 77; Dkt. 21-11.

On April 9, 2019, Arena Riparian filed a second amended complaint in the State Action. State Action at Dkt. 80; Dkt. 21-5 ("State SAC").  Relevant here, it added a claim against Ethiopian for aiding and abetting a breach of fiduciary duty by Sirimanne ("Count 11").  *Id.* ¶¶ 229–42.  On May 9, 2019, Ethiopian filed another motion to dismiss.  State Action at Dkt. 106; Dkt. 21-13 ("Second State MTD").  On June 10, 2019, Arena Riparian filed an opposition.  State Action at Dkt. 107; Dkt. 21-14.  On June 25, 2019, Ethiopian replied.  State Action at Dkt. 112; Dkt. 21-15.

On August 7, 2019, Justice Ostrager heard argument on the Second State MTD.  Dkt. 21-16.  From the bench, he dismissed the new Count 11 under N.Y. C.P.L.R. § 3211(a)(7) "because

the allegations of [Ethiopian's] substantial assistance [in Sirimanne's breach] are . . . entirely conclusory." *Id.* at 5.  He dismissed all other claims against Ethiopian, either for failure to state a claim or for lack of standing.  *Id.* at 5–6.  On August 8, 2019, Justice Ostrager issued a written order dismissing Ethiopian from the action.  State Action at Dkt. 126; Dkt. 21-17.  On it, he again checked the box stating that the disposition was "non-final."  Dkt. 126; Dkt. 21-17.

Arena Riparian did not seek leave to amend its complaint.  Nor did it move for reconsideration or appeal.  Dkt. 21 ¶ 23.  As such, Ethiopian ceased to be a party to the State Action and Justice Ostrager's rulings as to Ethiopian became final.

### B.    Procedural History of this Action

On June 18, 2021, Spoleto filed the original Complaint in this Court, and on June 21, 2021, corrected it.  Dkts. 1, 7.  On August 16, 2021, Ethiopian moved to dismiss.  Dkt. 17.  On September 7, 2021, Spoleto filed the AC.  Dkt. 20.  On September 27, 2021, Ethiopian filed its motion to dismiss the AC, Dkt. 21-19 ("MTD"), and supporting exhibits, Dkt. 21.  Ethiopian argues that the claims that Spoleto pursues in the AC—breach of contract, aiding and abetting a breach of fiduciary duty, and fraud—are barred by the doctrines of collateral estoppel and/or *res judicata*.  On October 12, 2021, Spoleto filed an opposition.  Dkt. 22 ("Opp'n").  On October 19, 2021, Ethiopian filed its reply.  Dkt. 25 ("Reply").

On November 16, 2021, the Court held argument.  *See* Dkt. 26.  Salient here, and as discussed in more detail below, argument isolated the difference between the allegations made by Ethiopian in its state-court complaints and Spoleto here as essentially the facts that came to light in Sirimanne's state-court deposition of December 4, 2020, to wit, his payments of $50,000 to Ethiopian, which Spoleto casts in the AC as bribes.  *See* Dkt. 20-2; Opp'n at 14–15 (calling "[Sirimanne's] recently discovered bribery" "core to" the AC).

## II.     Discussion

### A.     Applicable Legal Standards

#### 1.     Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145.  That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

#### 2.     *Res Judicata*

"A court may consider a *res judicata* defense on a Rule 12(b)(6) motion to dismiss when the court's inquiry is limited to the plaintiff's complaint, documents attached or incorporated therein, and materials appropriate for judicial notice." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 498 (2d Cir. 2014) (citation omitted).  When evaluating a prior action to determine whether claims are barred by *res judicata*, "courts routinely take judicial notice of documents filed in other courts, . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related findings." *Day v. Distinctive Pers., Inc.*, 656 F. Supp. 2d 331, 336 (E.D.N.Y. 2009) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

The party moving to dismiss under Rule 12(b)(6) on *res judicata* grounds must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000) (citations omitted). "[F]ederal courts must give state-court judgments the same preclusive effect as they would receive in courts of the same state." *Burkybile v. Bd. of Educ. Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir. 2004) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); 28 U.S.C. § 1738). "The law governing the doctrine of *res judicata* in a diversity action is 'the law that would be applied by state courts in the State in which the federal diversity court sits.'" *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 195 (2d Cir. 2010) (quoting *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001)). The applicable law here is New York law, the law actually applied in the State Action.

### a.    *"On the merits"*

"Whether a dismissal of a state court claim was on the merits is a matter of state law." *Corsini v. Bloomberg*, 26 F. Supp. 3d 230, 246 (S.D.N.Y. 2014), *aff'd in part, appeal dismissed in part sub nom. Corsini v. Nast*, 613 F. App'x 1 (2d Cir. 2015) (summary order) (citing *Cloverleaf Realty of N.Y., Inc. v. Town of Wawayanda*, 572 F.3d 93, 95 (2d Cir. 2009)). Under New York law, a dismissal for failure to state a claim under N.Y. C.P.L.R. § 3211(a)(7) is "presumptively not on [the] merits and lacks *res judicata* effect" unless the court so states, *DDR Constr. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 647 (S.D.N.Y. 2011), or the dismissal is with prejudice, *Gianatasio v. D'Agostino*, 862 F. Supp. 2d 343, 349 (S.D.N.Y. 2012). Such a statement need not "contain the precise words 'on the merits' in order to be given

*res judicata* effect; it suffices that it appears from the judgment that the dismissal was on the merits." *Randall's Island Aquatic Leisure, LLC v. City of New York*, No. 12 Civ. 6039 (CM), 2013 WL 2951945, at *3 (S.D.N.Y. June 13, 2013) (quoting N.Y. C.P.L.R. § 5013) (citing *Strange v. Montefiore Hosp. & Med. Ctr.*, 450 N.E.2d 235, 236 (N.Y. 1983).

Thus, "[a]bsent an affirmative indication that a § 3211(a)(7) dismissal constitutes a decision on the merits, that dismissal precludes, at most, relitigation . . . [of] whether the dismissed complaint states a cause of action under the applicable pleading standards." *Mejia v. City of New York*, No. 17 Civ. 2696 (NGG) (JO), 2020 WL 2837008, at *9 (E.D.N.Y. May 30, 2020).  Consistent with that, a "prior judgment, whether explicitly on the merits or not, is a bar to another action where 'the defects in the prior action are not corrected by the pleadings in the [later action].'" *Accolla v. LaDestri*, No. 87 Civ. 2272 (LBS), 1989 WL 52309, at *2 (S.D.N.Y. May 9, 1989) (cleaned up) (quoting *Binkowski v. Gen. Elec. Co.*, 266 N.Y.S.2d 577, 577 (N.Y. App. Div. 1966)).

        *b.*     *Privity*

"[*R*]*es judicata* applies to subsequent actions affecting assignees of parties to the earlier action, if the interest was transferred to the assignee after the commencement of the earlier action." *In re 19 Ct. St. Assocs., LLC*, 190 B.R. 983, 997 (Bankr. S.D.N.Y. 1996) (citing *Price v. Worldvision Enter., Inc.*, 455 F. Supp. 252, 259 (S.D.N.Y. 1978); *Teleprompter Corp. v. Polinsky*, 447 F. Supp. 53, 56 n.5 (S.D.N.Y. 1977)).[2]

---

[2] This element of *res judicata* is undisputedly established here.  As Ethiopian concedes, "[p]rivity is . . . established in the assignor-assignee relationship" between Arena Riparian and Spoleto.  MTD at 10–11 (citing AC ¶ 1); *see also* AC ¶ 1 ("Spoleto is the assignee of all of Arena Riparian's claims and rights resulting from the Agreement, including any and all tort claims against Ethiopian Airlines, including claims for fraud and aiding and abetting breach of fiduciary duty." (cleaned up)).  And it is undisputed that this assignment occurred after the State Action was commenced.

   c.      Raised or "could have been raised in a prior action"

New York courts take a "transactional approach" in conducting a *res judicata* analysis.

*Yeiser v. GMAC Mortg. Corp.*, 535 F. Supp. 2d 413, 422 (S.D.N.Y. 2008) (citation omitted).

"[O]nce a claim is brought to a final conclusion, all other claims arising out of the same

transaction or series of transactions are barred, even if based upon different theories or if seeking

a different remedy." *Giannone v. York Tape & Label, Inc.*, 548 F.3d 191, 194 (2d Cir. 2008)

(quoting *Josey v. Goord*, 880 N.E.2d 18, 20 (N.Y. 2007)).   "To determine whether two actions

arise from the same transaction or claim, we consider whether the underlying facts are related in

time, space, origin, or motivation, whether they form a convenient trial unit, and whether

their treatment as a unit conforms to the parties' expectations or business understanding or

usage." *TechnoMarine SA*, 758 F.3d at 499 (citation and quotation marks omitted).   "Even if

there are variations in the facts alleged or different relief is sought, if the actions are grounded on

the same gravamen of the wrong, *res judicata* applies." *Yeiser*, 535 F. Supp. 2d at 422.

### 3.      Collateral Estoppel

To determine whether collateral estoppel applies in a federal diversity suit, a federal court

applies the preclusion law "that would be applied by state courts in the State in which the federal

diversity court sits." *Goldman v. Rio*, 788 F. App'x 82, 83 (2d Cir. 2019) (summary order)

(citing *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1285 (2d Cir. 1986), *superseded on other

grounds by rule*); *Schlaifer Nance & Co. v. Est. of Warhol*, 764 F. Supp. 43, 45 (S.D.N.Y. 1991).

Important here, New York law treats collateral estoppel as "a narrower species of *res judicata*."

*Ryan v. N.Y. Tel. Co.*, 467 N.E.2d 487, 500 (N.Y. 1984).

Under New York law, the doctrine of collateral estoppel, or issue preclusion, "bars a

party from relitigating in a subsequent proceeding an issue clearly raised in a prior proceeding

and decided against that party where the party to be precluded had a full and fair opportunity to

contest the prior determination." *Buford v. Coombe*, 199 F.3d 1321, 1321 (2d Cir. 1999)

(quoting *Weiss v. Manfredi*, 639 N.E.2d 1122, 1122 (N.Y. 1994)).  Collateral estoppel applies

when "(1) the identical issue necessarily was decided in the prior action and is decisive of the

present action, and (2) the party to be precluded from relitigating the issue had a full and fair

opportunity to litigate the issue in the prior action." *Eastman Kodak Co. v. Asia Optical Co.*, No.

11 Civ. 6036 (DLC), 2012 WL 2148198, at *3–4 (S.D.N.Y. June 13, 2012), *aff'd*, 518 F. App'x

23 (2d Cir. 2013) (summary order).

"Collateral estoppel is an equitable doctrine . . . . Its invocation is influenced by

considerations of fairness in the individual case." *King v. Fox*, 418 F.3d 121, 130 (2d Cir. 2005)

(citation omitted).  "The party asserting issue preclusion bears the burden of showing that the

identical issue was previously decided, while the party against whom the doctrine is asserted

bears the burden of showing the absence of a full and fair opportunity to litigate in the prior

proceeding." *Eastman Kodak Co.*, 2012 WL 2148198, at *4 (quoting *Colon v. Coughlin*, 58 F.3d

865, 869 (2d Cir. 1995), *abrogated on other grounds by Tangreti v. Bachmann*, 983 F.3d 609 (2d

Cir. 2020)).  "In determining whether a party had a full and fair opportunity to litigate the issue,

the New York Court of Appeals has instructed that 'the various elements which make up the

realities of litigation,' should be explored, including 'the size of the claim, the forum of the prior

litigation, the use of initiative, the extent of the litigation, the competence and experience of

counsel, the availability of new evidence, indications of a compromise verdict, differences in the

applicable law and foreseeability of future litigation.'" *Kosakow v. New Rochelle Radiology*

*Assocs., Inc.*, 274 F.3d 706, 734 (2d Cir. 2001) (quoting *Schwartz v. Pub. Adm'r*, 246 N.E.2d

725, 729 (N.Y. 1969)).  If new evidence is uncovered after the prior action claimed to have

estoppel effect is "significant," "it cannot be found that a party was afforded a full and fair

opportunity to present his case [without] that evidence." *Khandhar v. Elfenbein*, 943 F.2d 244, 249 (2d Cir. 1991) (citation omitted).

### B.       Application to Spoleto's Claims in the AC

In moving to dismiss, Ethiopian argues that the three claims the AC brings—breach-of-contract; aiding and abetting breach of fiduciary duty; and fraud—are barred by the related doctrines of *res judicata* and collateral estoppel.

The Court first considers the AC's breach-of-contract and aiding-and-abetting breach of fiduciary duty claims. As to these, the doctrine of collateral estoppel is decisive. For the reasons explained below, under New York law, the manner in which Justice Ostrager dismissed these claims in state court did not itself categorically preclude Arena Riparian (or its assignee, Spoleto) from reprising such a claim in a later lawsuit. Whether such claims as articulated in the AC survive collateral estoppel instead turns on the factual material the AC adds in their support. If this new information is "significant" so as to cure the pleading defects that led to the dismissal of the State Action's parallel claims, then the Court must let those claims go forward, as it cannot find that Spoleto (or its assignor Arena Riparian) was afforded a full and fair opportunity to litigate them. *See Khandhar*, 943 F.2d at 249. Here, however, the new factual matter that the AC adds is sparse. The AC strains to portray the new allegations as evidencing bribes to cause Ethiopian officials to breach Ethiopian's Agreement to sell the Civil Assets to Arena Riparian. But these allegations, the Court holds, do not plausibly make out bribery, or come close. They do not cure the parallel State claims' pleading deficiencies. They are thus brought down by (apart from a continued failure to state a claim) collateral estoppel.

The Court then considers the AC's fraud claim. Such a claim was not brought in the State Action. As to this claim, the doctrine of *res judicata* is decisive. Under *res judicata*, a claim is barred if it "aris[es] out of the same transaction or series of transactions" as alleged in an

earlier state-court complaint, "even if based upon different theories or if seeking a different remedy." *Giannone*, 548 F.3d at 194. That principle bars Spoleto's fraud claim here.

### 1.     Analysis of the AC's Breach of Contract Claim

"To state a breach of contract claim under New York law, a plaintiff must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Bader v. Wells Fargo Home Mortg., Inc.*, No. 09 Civ. 9410 (PAE), 2012 WL 1428898, at *3 (S.D.N.Y. Apr. 25, 2012) (citing *Johnson v. Nextel Commc'ns Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).

In state court, Justice Ostrager dismissed Arena Riparian's breach-of-contract claim on the ground that the element of damages was inadequately pled. Tracking Ethiopian's motion to dismiss the State FAC, he held that "[Ethiopian] is protected by the limitation of liability language in [the Agreement]." Dkt. 21-10 at 13–14.

Ethiopian argues that the State Action's breach-of-contract claim was dismissed on the merits, such that *res judicata* bars pursuing such a claim anew in this Court. MTD at 12; Reply at 2. But New York *res judicata* doctrine is more nuanced. Although Justice Ostrager's analysis substantively faulted Arena Riparian for failing to allege the element of available damages, a dismissal for failure to state a claim under N.Y. C.P.L.R. § 3211(a)(7) is presumptively *not* on the merits, unless the dismissing court expressly so states, *DDR Constr. Servs.*, 770 F. Supp. 2d at 647, or states that the dismissal was with prejudice, *Gianatasio*, 862 F. Supp. 2d at 349. Here, Justice Ostrager stated neither.

Ethiopian counters by noting that *res judicata* can be found where it "appears from the judgment that the dismissal was on the merits." *Randall's Island Aquatic Leisure, LLC*, 2013 WL 2951945, at *3. It argues that, here, it should be, notwithstanding that Justice Ostrager did

not so state or dismiss the contract-breach claim with prejudice, because the pleading defect in

that claim was not of a nature "that could be cured by amending the complaint."  MTD at 12.

That is incorrect.  Justice Ostrager's single-sentence disposition of the contract-breach

claim did not foreclose the possibility that an amended or new complaint could allege facts that

make the damages limitation clause in the Agreement between Arena Riparian and Ethiopian

unenforceable.  And the nature of a dismissal on the basis of a damages-limitation provision is

that facts, in theory, can be pled that neutralize such a provision.  Under New York law, while

parties may "contract[] for . . . exclusive remedy provision[s]," they "cannot use contractual

limitation of liability clauses to shield themselves from liability for their own fraudulent

conduct."  *Citibank, N.A. v. Itochu Int'l Inc.*, No. 01 Civ. 6007 (GBD), 2003 WL 1797847, at *2

(S.D.N.Y. Apr. 4, 2003) (quoting *Turkish v. Kasenetz*, 27 F.3d 23, 27–28 (2d Cir. 1994)); *see

also Koch v. Greenberg*, No. 07 Civ. 9600 (BSJ) (DCF), 2012 WL 7997484, at *6 (S.D.N.Y.

Sept. 30, 2012).  Damage-limitation provisions thus may be ineffective where "the defendants'

conduct . . . 'smacks of intentional wrongdoing' and amount[s] to egregious intentional

misbehavior."  *Air China, Ltd. v. Kopf*, 473 F. App'x 45, 49 (2d Cir. 2012) (summary order)

(quoting *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983)).

Wrongdoing sufficient to implicate this doctrine includes "(1) delays caused by the contractee's

bad faith or its willful, malicious, or grossly negligent conduct, (2) uncontemplated delays, (3)

delays so unreasonable that they constitute an intentional abandonment of the contract by the

contractee, and (4) delays resulting from the contractee's breach of a fundamental obligation of

the contract."  *Travelers Cas. & Sur. Co.*, 735 F. Supp. 2d at 58 (quoting *Corinno Civetta

Constr. Corp. v. City of New York*, 493 N.E.2d 905, 910 (N.Y. 1986)).  In contrast, "[c]ontractual

nonperformance that is merely in a defendant's economic self-interest does not suffice, even if it

is intentional." *Ace Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 ex rel. HSBC Bank USA, Nat. Ass'n v. DB Structured Prod., Inc.*, 5 F. Supp. 3d 543, 556 (S.D.N.Y. 2014) (citing *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504 (N.Y. 1994) (further citations omitted)).[3]

"Whether the challenged conduct rises to the level of 'intentional wrongdoing' is a question of fact." *Tide Natural Gas Storage I, L.P. v. Falcon Gas Storage Co.*, No. 10 Civ. 5821 (KMW), 2011 WL 4526517, at *6 (S.D.N.Y. Sept. 29, 2011) (cleaned up). The *res judicata* analysis of whether the defects in the prior action have been corrected thus turns on a factual inquiry into whether the AC—unlike its state-court progenitor—adequately pleads intentional wrongdoing. And insofar as it turns on this factual question, the *res judicata* inquiry effectively collapses into—it becomes coterminous with—the collateral estoppel inquiry into whether Spoleto's assignor had a full and fair opportunity to litigate its case, *Ryan*, 467 N.E.2d at 500, and with the Rule 12(b)(6) inquiry as to whether the AC states a plausible claim.

Here, Spoleto's AC purports to allege intentional wrongdoing as part of Ethiopian's conduct that led to its breach of the Agreement with Arena Riparian. The AC broadly asserts that Sirimanne bribed Ethiopian officials to lead them to breach the agreement to sell the Civil Assets to Arena Riparian. *See* AC ¶¶ 26–37; Opp'n at 12–17. The issue in applying collateral estoppel therefore is whether the AC's new facts—all drawn from several pages in Sirimanne's

---

[3] The New York Court of Appeals recently clarified that grossly negligent conduct will render unenforceable only exculpatory or nominal damages clauses in a contract. *Matter of Part 60 Put-Back Litig.*, 165 N.E.3d 180, 188 (N.Y. 2020). That subtlety is of no moment here, because the basis on which Spoleto's AC purports to avoid the damage-limitation provision is conduct that it claims was intentionally wrongful. *See* AC ¶¶ 26–37, 52, 66, 75, 88.

December 4, 2020 deposition in the State Action[4]—make its pleading of such wrongdoing

plausible, so as to render the damages limitation provision on which Justice Ostrager relied

unenforceable.[5]

        The AC does not do so.  For multiple reasons, the sparse factual allegations added by the

AC do not plausibly allege bribery of Ethiopian to secure its breach of its Agreement to sell the

Civil Assets to Arena Riparian.  Critically, as Spoleto concedes, Sirimanne's deposition is its

only factual basis for claiming bribery; that deposition is cognizable because Ethiopian's AC

cites it.  But a review of the few relevant pages of that deposition reveals that the AC's labeling

---

[4] Sirimanne's deposition in that case went forward, notwithstanding Justice Ostrager's earlier dismissal of the claims against Ethiopian, because claims brought by Arena Riparian against other parties, including Sirimanne, survived.  *See* Dkt. 21-16.

[5] The cases Ethiopian cites (MTD at 11–13) in claiming a categorical bar to repleading are inapposite because they presuppose the issue to be decided here, to wit, whether Spoleto's newly alleged facts cure the State complaints' pleading defects.  In *Feigen v. Advance Capital Mgmt. Corp.*, the New York Appellate Division held contract breach claims precluded—under *res judicata*—after finding that "plaintiffs could not assert viable claims against . . . defendants arising out of the facts and transactions set forth in the original complaint."  536 N.Y.S.2d 786, 788 (N.Y. App. Div. 1989).  Here, however, Spoleto purports to allege newly discovered facts giving rise to a claim that would survive the basis for Justice Ostrager's dismissal, *i.e.* the acceptance of bribes to not perform, which if adequately pled would make out a purposeful breach of the Agreement that made the damages limitation unenforceable.  In *Jericho Grp. Ltd. v. Midtown Dev., L.P.*, the Appellate Division found that the prior action had been "dismissed on the merits, and not merely because of technical pleading defects," where the "the claims are based on the same alleged misconduct" and "plaintiff had reviewed the [evidence allegedly establishing] defendants' alleged fraud prior to commencing the first action."  889 N.Y.S.2d 18, 19–20 (N.Y. App. Div. 2009).  Here, again, Spoleto seeks to revive contract breach claims based on purported consequential evidence obtained after the dismissal of the original claims.  *Flynn v. Sinclair Oil Corp.*, too, in finding *res judicata*, presupposes the issue that the Court here must resolve: whether the new complaint's "added allegations" are "irrelevant," 246 N.Y.S.2d 360, 361 (N.Y. App. Div. 1964).  Ethiopian's remaining cases are likewise distinguishable, because in each, the new complaint failed to cure the pleading defects that led to the dismissal of the predecessor claim for failure to state a claim.  *See Binkowski*, 266 N.Y.S.2d at 577; *Blank v. Miller*, 504 N.Y.S.2d 580, 582 (N.Y. App. Div. 1986); *Beninati v. Nicotra*, 657 N.Y.S.2d 414, 415 (N.Y. App. Div. 1997); *Schneider v. David*, 602 N.Y.S.2d 130, 131 (N.Y. App. Div. 1993).

as bribery of the facts to which Sirimanne attested cherrypicks, and badly distends, his far more quotidian testimony.

In the excerpt incorporated into the AC, Sirimanne testified to cash payments by him to 16–18 mechanics and engineers to prepare the Military Assets for delivery from Ethiopia to CSDS in the United States.  Sirimanne Dep. Tr. at 231–32.  Although these workers were employees of Ethiopian, Sirimanne attested, he hired them to work for him on their own time under a separate maintenance agreement.  *Id.* at 233, 237.  He attested that he paid the workers for (1) maintenance services, at a rate of time and a half their regular pay rate; (2) transportation to and from the military base on which the Military Assets were located, (3) post-work dinner costs, and (4) renting and buying equipment.  *Id.* at 234–36.

Sirimanne testified that these payments—which totaled roughly $50,000—were coordinated on the ground in Ethiopia by CSDS's Vice President Alan Auger, who was instructed to "hire anybody he chose and get any equipment he needed into the base to get the job done."  *Id.* at 236–37 (cleaned up).  When Auger struggled to ensure that the job was finished in time, Sirimanne gave $10,000 (part of the $50,000) to Melaku, Ethiopian's Head of Engineering and Director of MKO Sales and Marketing, who paid additional workers to perform the same maintenance services.  *Id.* at 239–41.

These facts to which Sirimanne attested describe paying workers—subordinates at Ethiopian—for actual services rendered in connection with the prosaic task of readying an airplane not covered by the Agreement for a sale.  For multiple reasons, these facts do not support a plausible, non-speculative, allegation of bribery—or anything close.

First, the facts pled do not support that Sirimanne made any payment to any official or other recipient at Ethiopian in a position to thwart Ethiopian's agreement with Arena Riparian.

20

The only recipients that Sirimanne (or the AC identifies) for the payments he brought about are Melaku and 16–18 unnamed Ethiopian employees. AC ¶¶ 29–34; Sirimanne Dep. Tr. at 231, 239. The AC casts Sirimanne as offering $10,000 to Melaku in exchange for his 'influence.'" AC ¶ 31. But the deposition, the source of this nebulous allegation, does not admit any facts—and the AC does not plead any—indicating that Melaku took steps to undermine the Agreement. Rather, the deposition transcript makes clear that the payment to Melaku was intended to be passed on to 16–18 employees who were front-line mechanics and engineers.[6] Sirimanne Dep. Tr. at 237, 240–41. On the facts alleged, none of these workers were in a position to scuttle the Agreement between Arena Riparian and Ethiopian. According to the testimony, they were hired instead to perform physical labor outside regular work hours. Even drawing all "reasonable inferences" in Spoleto's favor, *Koch*, 699 F.3d at 145, the AC and cognizable deposition transcript do not establish conduct that "smacks of intentional wrongdoing." *Kalisch-Jarcho, Inc.*, 448 N.E.2d at 416.

Second, the payments about which Sirimanne testified concerned the *Military* Assets only. These assets were not covered by the Agreement at issue here, which concerned the sale of the Civil Assets to Arena Riparian. *See* Sirimanne Dep. at 231–33. The AC baldly declares that Sirimanne used these payments to "pressure [Ethiopian] to breach and abandon" the Agreement, AC ¶ 26. But it does not plead—and the cognizable deposition transcript does not provide—any facts linking Sirimanne's payments to workers in connection with the Military Assets to the Civil Assets.

---

[6] Indeed, the AC never alleges that Melaku was *paid* $10,000, but was merely *offered* that amount. *See* AC ¶¶ 30–31.

Third, the cognizable facts support a different—and far more plausible—explanation for Ethiopian's decision not to close the Agreement to sell the Civil Assets to Arena Riparian. As Spoleto's AC concedes, Sirimanne proposed "a more lucrative deal" to Ethiopian, "offer[ing] more money for the [Civil] Assets"—specifically, "$1,000,000 above what [Ethiopian] had agreed to accept from Arena Riparian." *Id.* ¶¶ 26–27, 80. And the damages-limitation provision cabined the economic consequences to Ethiopian from breaching in favor of Sirimanne's better offer.

On the facts pled, it was therefore consistent with Ethiopian's "economic self-interest," *Ace Sec. Corp. Home Equity Loan Tr.*, 5 F. Supp. 3d at 556, not to close the deal with Arena Riparian. Such an "efficient breach" of contract would not qualify as intentional misconduct rendering the Agreement's damages limitation clause unenforceable. The repeated invocations of the word "bribery," *see, e.g.*, AC ¶¶ 3, 27–37, 69, 80, 82, unsupported by concrete factual allegations, do not make the AC's claim of bribery plausible, let alone equally or more plausible than that the economically rational account in which Ethiopian pursued a better offer, and that the AC itself supports. *Cf. Twombly*, 550 U.S. at 552 (affirming dismissal of Sherman Act claim where complaint's allegations made benign explanation of the challenged conduct—to wit, that in consciously setting parallel prices, alleged co-conspirators had engaged in "independent self-interested conduct"—equally plausible as the claim of conspiracy).

Stripped of the ill-pled factual claim that Sirimanne bribed Ethiopian officials to lead them to steer the Civil Asset sale away from Arena Riparian, the AC here is "virtually identical to [the State FAC's Count 7], previously dismissed for failure to state a cause of action"—the allegations it adds are "irrelevant." *Flynn*, 246 N.Y.S.2d at 361. Spoleto thus has proven unable to "correct[]" the pleading defects that doomed Arena Riparian's breach-of-contract claim in the

State Action.  *See Accolla*, 1989 WL 52309, at *2.  Without such factual supplementation, Spoleto cannot claim that its assignor was deprived of "a full and fair opportunity to contest" the determination of an "issue clearly raised in a prior proceeding."  *Buford*, 199 F.3d at 1321. There was thus no such issue to raise and litigate then, and there is none now.

Accordingly, even though Justice Ostrager's ruling in the State Action to the effect that Arena Riparian had not pled available damages was not "on the merits" under New York law, the doctrine of collateral estoppel—a form of *res judicata* under New York law—still bars Spoleto's breach-of-contract claim.  And this claim would, for the same reason, fail to state a claim, insofar as the AC does not plead facts that make the Agreement's damage-limitation clause unenforceable.

### 2.    Analysis of the AC's Aiding and Abetting Breach of Fiduciary Duty Claim

Under New York law, "[a] claim for aiding and abetting a breach of fiduciary duty requires (1) 'a breach by a fiduciary of obligations to another, of which the aider and abettor had actual knowledge,' (2) 'that the defendant knowingly induced or participated in the breach,' and (3) 'that plaintiff suffered damage as a result of the breach.'"  *Nielsen Co. (US), LLC v. Success Sys., Inc.*, No. 11 Civ. 2939 (LAP) (FM), 2013 WL 1197857, at *9 (S.D.N.Y. Mar. 19, 2013) (quoting *In re Sharp Int'l Corp.*, 403 F.3d 43, 49–50 (2d Cir. 2005)) (further citations omitted). For an alleged aider and abettor to "knowingly participate[] in a breach of fiduciary duty," he or she must "provide[] 'substantial assistance' to the primary violator."  *In re Sharp Int'l Corp.*, 403 F.3d at 50 (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (N.Y. App. Div. 2003)). Substantial assistance requires that the alleged aider and abettor "affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.  [T]he mere

inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." *Id.* (citation omitted).

Spoleto's claim that Ethiopian aided and abetted Sirimanne and Keller's breach of their fiduciary duty to Arena Riparian is also precluded by collateral estoppel.  It bars this claim because, as with the breach-of-contract claim, Spoleto has not identified a basis on which Arena Riparian was unable to fully and fairly litigate this claim in the State Action.  Critically, in the State Action, Arena Riparian (Spoleto's assignor) alleged that Ethiopian knew of Sirimanne and Keller's fiduciary duties to Arena Riparian based on the communications sent by Arena Riparian's counsel and Chaput in July 2018 and the meetings Ethiopian had with Chaput and Nayar.  State SAC ¶¶ 96–100, 127, 234.  Arena Riparian further alleged Ethiopian substantially assisted Sirimanne and Keller's breach of their fiduciary duties, by continuing to negotiate with them thereafter, concluding the sale of the Military Assets to CSDS, refusing to disclose that separate purchase agreement to Arena Riparian, refusing Arena Riparian's inspectors access to the Civil Assets as part of the closing activities, and delaying execution of the Outside Delivery Date. *Id.* ¶¶ 112–36, 153–54, 235–39.

Justice Ostrager based his dismissal of this claim in the State Action on the ground that "the allegations of substantial assistance are . . . entirely conclusory."  Dkt. 21-16 at 5.  Arena Riparian did not thereafter move to amend or appeal.  And the only new facts that Spoleto's AC pleads are the same ones, drawn from Sirimanne's deposition, regarding the payments to Melaku and 16–18 Ethiopian mechanics and maintenance workers for their extra work to ready the Military Assets for sale. *See* AC ¶¶ 26–37 (citing Sirimanne Dep. Tr.).

Much as these factual allegations did not plausibly plead that bribery was used to secure a breach of the Agreement to sell the Civil Assets, they do not plausibly plead assistance or

concealment of as much. Indeed, there is no allegation in the AC that for such workers to take on such additional work for pay was a breach of any duty by any person. This new factual detail helps explain the means by which the Military Assets came to be ready for transfer from Ethiopian to CSDS. But it does no more than that. It does not even concern the Civil Assets at issue.

Where modest variations in the background facts alleged do not alter the "gravamen of the wrong," *Yeiser*, 535 F. Supp. 2d at 422, as originally pled, a plaintiff cannot avoid preclusion. Such is the case here. The scant facts added by the AC do not cure the deficiency identified by Justice Ostrager, to wit, the lack of well-pled facts indicating that Ethiopian took affirmative steps to assist Sirimanne and Keller in their alleged breach of fiduciary duties to Arena Riparian. *In re Sharp Int'l Corp.*, 403 F.3d at 50. Because the AC does not plead "significant" new supporting information, Justice Ostrager's dismissal of the earlier breach-of-fiduciary duty claim collaterally estops Spoleto's pursuit of a successor claim here. *Khandhar*, 943 F.2d at 249.

### 3.     Fraud

To prove fraud in a breach of contract action under New York law, "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)); *Axginc Corp. v. Plaza Automall, Ltd.*, 759 F. App'x 26, 30 (2d Cir. 2018) (summary order).

"Where 'a claim to recover damages for fraud is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in

25

fraud does not lie.'" *Integrated Constr. Enters., Inc. v. GN Erectors, Inc.*, No. 16 Civ. 5561 (PAE), 2020 WL 614991, at *5 (S.D.N.Y. Feb. 10, 2020) (quoting *McKernin v. Fanny Farmer Candy Shops, Inc.*, 574 N.Y.S.2d 58, 59 (N.Y. App. Div. 1991)); *see also Metro. Transp. Auth. v. Triumph Advert. Prods., Inc.*, 497 N.Y.S.2d 673, 675 (N.Y. App. Div. 1986) (dismissing fraud claim because it alleged "only a breach of the representation of performance implicit in making the bid and a subsequent assurance of performance by" defendant).

The parties disagree whether Ethiopian's representations after July 19, 2018 that it intended to complete the Agreement and that it intended to extend the Outside Delivery Date from July 31, 2018 to August 31, 2018 constituted a promise extraneous to the Agreement. *Compare* MTD at 24–25 *with* Opp'n at 22–25.  The Court need not reach this question because *res judicata* bars Spoleto's claim.

Arena Riparian did not bring a fraud claim in the State Action, but it is still barred here from doing so if the new claim "aris[es] out of the same transaction or series of transactions . . . , even if based upon different theories or if seeking a different remedy." *Giannone*, 548 F.3d at 194.  This is so here.  The conduct underlying this claim is quite closely "related in time, space, origin, [and] motivation" to the conduct underlying the State Action. *TechnoMarine SA*, 758 F.3d at 499.  Spoleto's fraud claim rests on its allegations that Ethiopian, from July 19, 2018 onward, misrepresented its intent to complete the deal; intentionally delayed the closing beyond the Outside Delivery Date; requested changes to Agreement terms; and denied Arena Riparian's inspectors access to the Civil Assets.  *See* AC ¶¶ 105–06.  These facts were all pled in the State Action.  *See* State SAC ¶¶ 110–36.  The new allegations concerning Sirimanne's payments to maintenance workers and the like do not make the conduct pled in the AC, for *res judicata*

purposes, a different "transaction or series of transactions" from that pled in the State Action.

*Giannone*, 548 F.3d at 194.

**CONCLUSION**

For the foregoing reasons, the Court grants Ethiopian's motion to dismiss in full.  The

Clerk of Court is respectfully directed to close this case.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: February 3, 2022
       New York, New York